PRESENT:  All the Justices

TERRY ANTONIO WHITE

v.  Record No. 210168

UNITED STATES OF AMERICA

OPINION BY
JUSTICE D. ARTHUR KELSEY
OCTOBER 14, 2021

UPON A QUESTION OF LAW CERTIFIED BY THE UNITED STATES
COURT OF APPEALS FOR THE FOURTH CIRCUIT

The United States Court of Appeals for the Fourth Circuit entered a certification order

asking this Court to answer a determinative question of Virginia law presented in *United States*

*v. White*, 987 F.3d 340, 341 (4th Cir. 2021).  Pursuant to Article VI, Section 1 of the Constitution

of Virginia and Rule 5:40, we accepted the following question:  "Under Virginia common law,

can an individual be convicted of robbery by means of threatening to accuse the victim of having

committed sodomy?"  The answer is *yes* if the accusation of "sodomy" involves a crime against

nature under extant criminal law.  We have four prior opinions recognizing this English

common-law doctrine, and upon further reflection and research, we find no convincing historical

arguments demonstrating that our view was mistaken.

I.

In federal district court, Terry Antonio White pleaded guilty to being a felon in

possession of a firearm in violation of a federal statute.  The United States requested that he

receive an enhanced sentence under the Armed Career Criminal Act ("ACCA"), 18 U.S.C.

§ 924(e)(1), based on his prior convictions for three predicate violent felonies, which included a

robbery conviction in Virginia.  White objected to the proposed sentencing enhancement,

arguing that under the ACCA, a felony is defined as a violent felony only if it categorically

requires a showing of some "use, attempted use, or threatened use of physical force against the

person of another," 18 U.S.C. § 924(e)(2)(B)(i).[1]  Relying on a common-law principle that is

little known yet not forgotten, White argued that the physical force element is not always

required to prove robbery in Virginia.  In our opinion, he is correct.

## II.

### A.

"There is in Virginia no such crime as statutory robbery."  *Falden v. Commonwealth*, 167

Va. 542, 545 (1937).  Virginia's robbery statute prescribes the degrees of punishments for

robbery, but not its elements.  In Virginia, robbery is a common-law crime.  *Durham v.*

*Commonwealth*, 214 Va. 166, 168 (1973).  On four occasions, each with unanimous opinions, we

have recognized under Virginia common law that

> [t]o constitute [a robbery] offense, there must be (1) violence, but
> it need only be slight, for anything which calls out resistance is
> sufficient; or, what will answer in place of actual violence, there
> must be such demonstrations as put the person robbed in fear.  *The*
> *demonstrations or fear must be of a physical nature, with the*
> *single exception that, if one parts with his goods through fear of a*
> *threatened charge of sodomy, the taking is robbery*.

*Houston v. Commonwealth*, 87 Va. 257, 264 (1890) (emphasis added), *quoted with approval in*

*Fleming v. Commonwealth*, 170 Va. 636, 639 (1938), *Falden*, 167 Va. at 546, *and Maxwell v.*

*Commonwealth*, 165 Va. 860, 864-65 (1936).

Virginia's earliest legal treatises confirm our understanding of this common-law robbery

doctrine.  They recognize that threatening to accuse someone of committing a crime against

---

[1] Despite the esoteric nature of the issue we must address, its resolution will have very real consequences.  If the federal sentencing enhancement applies, White's sentence will be 15 years, which is the minimum under the enhanced punishment required by 18 U.S.C. § 924(e)(1), and a period of 5 years supervised release, which is the maximum under 18 U.S.C. § 3583(b)(1). *See* 1 J.A. at 100-01.  Without the enhancement, his sentence would have been a maximum of 10 years with a maximum period of 3 years supervised release.  *See* 18 U.S.C. § 924(a)(2); 18 U.S.C. § 3583(b)(2); 1 J.A. at 73.

nature can be constructive violence.  William Hening, one of Virginia's leading legal scholars

after the Revolution, explained:

> *And to obtain property, by threatening to accuse another of having
> been guilty of an unnatural crime, has been held, upon the solemn
> opinion of all the judges, to be an act sufficient* to raise in the mind
> of the party menaced such a terror and apprehension of mischief,
> *as to constitute the offence by putting in fear*; for the law, in odium
> spoliatoris, will presume fear where there appears to be so just a
> ground for it.

William Waller Hening, The New Virginia Justice 510 (2d ed. 1810) (emphases added) (quoting

1 William Hawkins, A Treatise of the Pleas of the Crown 236 (Thomas Leach ed., 7th ed.

1795)).[2]  Other early Virginia treatise authors also confirm this doctrine:

> The cases of robbery effected by fear of injury to the character,
> have been those in which alarm has been excited by imputing to
> the party robbed, or by *threatening to accuse him of, sodomitical
> practices*.  The imputation of so odious and detestable a crime,
> productive as it might be of so much injury to the person charged,
> may naturally, especially on the accusation being first made and
> before the person has had time to reflect on the protection which
> the law affords to innocence, inspire as great a degree of fear as the
> threat of personal violence.

John A.G. Davis, A Treatise on Criminal Law 205 (1838) (emphasis added); *see also* Joseph

Mayo, A Guide to Magistrates 593-95 (2d ed. 1860) (recognizing that in Virginia, based upon

English common-law authorities, an accusation of an "unnatural crime" is a sufficient form of

constructive force for a robbery conviction).

---

[2] "Between 1795 and his death in 1828, William Waller Hening published numerous legal reference books that were among the most read of his time," and "[o]f these, none was more significant than his *New Virginia Justice*."  *Introduction* to "Esteemed Bookes of Lawe" and the Legal Culture of Early Virginia 3, 7 (Warren M. Billings & Brent Tarter eds., 2017). Thomas Jefferson even praised The New Virginia Justice as "a work of great utility for the public generally."  Letter from Thomas Jefferson to William Waller Hening (May 8, 1822) (on file with the Library of Congress), https://www.loc.gov/resource/mtj1.053_0129_0130/?sp=1.

No Virginia judicial opinion or legal scholar has ever challenged the historicity of this common-law doctrine.  Nor do leading modern legal scholars.  *See* 4 Charles E. Torcia, Wharton's Criminal Law § 462, at 21 (15th ed. 1996) ("At common law . . . a threat to accuse a person of sodomy was sufficient, and it was immaterial whether the person was or was not guilty of such offense." (footnote omitted)); 3 Wayne R. LaFave, Substantive Criminal Law § 20.3(d)(2), at 242 (3d ed. 2018) ("A mere threat, unaccompanied by physical force, to accuse the property owner of the crime of sodomy (but not of other crimes) has been held a sufficient threat for robbery."); 7 Ronald J. Bacigal & Corinna Barrett Lain, Virginia Practice Series: Criminal Offenses and Defenses 274 n.8 (2020-2021 ed.) (agreeing that "[a]t common law obtaining money by a threat to expose another as a sodomite was sufficient to convict of robbery" while correctly pointing out that under Code § 18.2-59 this conduct would be "clearly sufficient for extortion").[3]

---

[3] The United States cites Professor Bacigal's treatise as authority for its argument that Virginia common law has not adopted the crime-against-nature doctrine.  *See* Appellee's Br. at 28.  We read Professor Bacigal's statement, however, only to say that conduct previously punishable as common-law robbery may now be punished as extortion pursuant to Code § 18.2-59.  While this may be true in some cases, the extortion statute does not necessarily abolish common-law robbery as an alternative criminal charge when the factual circumstances would also support a conviction for statutory extortion.  Under settled principles, "[t]he common law will not be considered as altered or changed by statute unless the legislative intent is plainly manifested.  A statutory change in the common law is limited to that which is expressly stated or necessarily implied because the presumption is that no change was intended."  *Boyd v. Commonwealth*, 236 Va. 346, 349 (1988) (citation omitted).

The extortion statute existed when we issued our opinions in *Fleming*, *Maxwell*, *Falden*, and *Houston*.  We did not then and do not now conclude that the extortion statute affected any aspects of common-law robbery.  To be sure, there is a "distinction between statutory extortion and robbery by intimidation" because "in the former the victim consents to part with his money or property, although his consent is induced by the unlawful threat," while in the latter, "the intimidation is so extreme as to overcome the will of the victim and cause him to part with his money or property without consent."  Rollin M. Perkins & Ronald N. Boyce, Criminal Law 451 (3d ed. 1982).

4

The scope of this common-law doctrine turns on the *criminal* not colloquial sense of the word "sodomy" — a term describing a broad range of "sodomitical practices," Davis, *supra*, at 205, and generically called a "crime against nature," a "crimen innominatum," or an "unspeakable crime," Black's Law Dictionary 1675 (11th ed. 2019). Broadly speaking, sodomitical practices included pederasty, bestiality, and other sexual offenses subject to criminal punishment. Blackstone called all such sodomitical practices "crime[s] against nature." 4 William Blackstone, Commentaries *215. *See generally* Henry Finch, Law, or, a Discourse Thereof 219 (1759); Bryan A. Garner, A Dictionary of Modern Legal Usage 815 (2d ed. 1995); Perkins & Boyce, *supra* note 3, at 465; Arthur Allen Leff, *The Leff Dictionary of Law: A Fragment*, 94 Yale L.J. 1855, 1866 (1985).

None of these offenses were common-law crimes under English common law. Instead, they were first treated as "ecclesiastical offense[s]" that were later deemed to be crimes by penal statutes. Perkins & Boyce, *supra* note 3, at 465; *see also* Garner, *supra*, at 815 ("*Sodomy* was not a common-law offense, though an early statute criminalizing it became a part of the common law of many American jurisdictions, most of which now have anti-sodomy statutes."); Ephraim Heiliczer, *Dying Criminal Laws: Sodomy and Adultery from the Bible to Demise*, 7 Va. J. Crim. L. 48, 57-59 (2019) (surveying the historical record of criminalizing sodomitical practices beginning with the 1533 Act of Parliament criminalizing the "Vice of Buggery"[4]). For our purposes, this is a crucial aspect of the crime-against-nature doctrine. English common law predicated the crime-against-nature doctrine on an accusation of an illicit sexual practice that was deemed to be a crime punishable under applicable criminal statutes at the time of the alleged

---

[4] The terms "buggery" and "sodomy" have been treated as close synonyms in English law and American law, respectively. *See* Perkins & Boyce, *supra* note 3, at 465 n.23. "English statutes used 'buggery' to cover the whole area," but "'[s]odomy' has been preferred in this country." *Id.*

robbery. Properly applied, therefore, the doctrine does not reach sexual acts that do not implicate criminal liability.

Under modern Virginia law, statutory crimes against nature continue to exist. As we observed in *Toghill v. Commonwealth*, "[c]rimes against nature" include "any person" having "carnal knowledge" with a "brute animal" or "cunnilingus, fellatio, anilingus, or anal intercourse" with a daughter, granddaughter, son, grandson, brother, sister, father, or mother. 289 Va. 220, 231 (2015); *see* Code § 18.2-361 (imposing enhanced punishment for crimes against nature involving juvenile victims). Other Virginia statutes specifically criminalize "forcible sodomy" involving "cunnilingus, fellatio, anilingus, or anal intercourse" by an adult with a child or with any victim against his or her will. Code § 18.2-67.1; *see also* Code § 18.2-63 (prohibiting any person from "carnally know[ing], without the use of force, a child" between the ages of 13 and 15, which includes "cunnilingus, fellatio, anilingus, anal intercourse, and animate and inanimate object sexual penetration"); Code § 18.2-67.5(A) (prohibiting "[a]n attempt to commit . . . forcible sodomy"); Code § 18.2-370(A), (D) (prohibiting any adult "with lascivious intent" from "knowingly and intentionally" proposing to a child under 15 years of age the performance of "anal intercourse, cunnilingus, fellatio, or anilingus" and prohibiting any parent, step-parent, grandparent, or step-grandparent from proposing the same with a child, step-child, grandchild, or step-grandchild who is between 15 and 18); Code § 18.2-370.1(A) (prohibiting an adult with a custodial or supervisory relationship over a child under 18 from proposing to such child the performance of "anal intercourse, cunnilingus, fellatio, or anilingus" or proposing that the child engage in sodomy with another person).

Thus, if this understanding of common-law robbery is correct — as we stated in *Fleming*, *Maxwell*, *Falden*, and *Houston* — then one who successfully obtains money or any valuable property from the presence of a victim by threatening to publicly accuse the victim of an extant

6

crime against nature (such as bestiality or paternal anal sodomy with a minor daughter) has

committed robbery.

B.

We accepted the Fourth Circuit's invitation to revisit this issue because we want to ensure

that we have correctly understood the common law on this point.  This is a task that we are duty-

bound to perform given the command of Code § 1-200, which provides that "[t]he common law

of England, insofar as it is not repugnant to the principles of the Bill of Rights and Constitution

of this Commonwealth, shall continue in full force within the same, and be the rule of decision,

except as altered by the General Assembly."[5]

Our revisiting of this issue, however, does not imply that we have the liberty to simply

disagree with English common law.  "In Virginia, it would be a violation of the constitution for

the *courts* to undertake to supply all defects of the common law not already supplied by statute.

That is the exclusive province of the *legislature*."  1 St. George Tucker, Blackstone's

Commentaries, Editor's App. Note E, at 405 (1803) (emphases in original).  "[A] decision to

---

[5] As a preliminary matter, we must address our statement in *Commonwealth v. Morris*, 281 Va. 70, 81-82 (2011), that appears to fix 1607 as the relevant date for adoption of English common law.  *Morris* seemingly chose that date based upon a clause in the 1607 Jamestown Charter, a royal charter granted by King James I to a private entity, the Virginia Company of London.  However, the Jamestown Charter was not a public law of the Commonwealth of Virginia, a sovereign state that came into existence more than a century-and-a-half later.  And neither the adoption of English common law by the Fifth Virginia Convention on July 3, 1776, *see* 9 William Waller Hening, The Statutes at Large 127 (1821); The Proceedings of the Convention of Delegates Held at the Capitol, in the City of Williamsburg in the Colony of Virginia, on Monday, the 6th of May, 1776, at 82 (1816), nor the General Assembly's 1792 enactments, *see* 1792 Acts ch. 79 (current codification at Code § 1-200), *reprinted in* 1 Samuel Shepherd, Statutes at Large 199-200 (1835), backdate the Commonwealth's reception of English common law to the date of the Jamestown Charter.  That said, given our holding in this case, it is unnecessary for us to address which of these two dates — 1776 or 1792 — fixes the date of the Commonwealth's adoption of English common law.  We thus offer no opinion on this subject.

abrogate [a] longstanding common law principle is the proper function of the legislature, not of the courts." *Robinson v. Matt Mary Moran, Inc.*, 259 Va. 412, 417-18 (2000).

Under English common law, robbery constituted a taking from the person "by force *or* a previous putting in fear." 4 Blackstone, *supra*, at *242 (emphasis added). While robbery was most often proved under this force-or-fear dichotomy through actual, physical force, "actual violence is not the only means by which a robbery may be effected" because "it may also be effected by fear, which the law considers as constructive violence." 2 William Oldnall Russell, A Treatise on Crimes and Indictable Misdemeanors 67 (2d ed. 1828). English common law considered one such form of fear to be serious enough to constitute robbery even in the absence of any threat of physical force. The threat of a public accusation of a crime against nature or a crimen innominatum, which included various "sodomitical practices," was considered to be "constructive violence" when coupled with a demand for money or property. *Id.* at 67, 75-76.

Scholars of English law have uniformly acknowledged the English common-law roots of this concept. *See, e.g.*, 2 Joel Prentiss Bishop, Commentaries on the Criminal Law § 1172, at 659 (7th ed. 1882) (recognizing that "the English cases" treat an accusation of a crime against nature as sufficient to find the requisite incitement of fear to constitute robbery); William L. Clark & William L. Marshall, A Treatise on the Law of Crimes 556 (Herschel Bouton Lazell ed., 2d ed. 1905) (recognizing that "threaten[ing] to accuse another of an unnatural crime, — sodomy, — and thereby obtain[ing] property from him" is sufficient for robbery); 1 Hawkins, *supra*, at 215 & n.3 (John Curwood ed., 8th ed. 1824) (recognizing a threat of being accused of "an unnatural crime" to be a "sufficient" act of "constructive violence"); 1 Russell, *supra*, at 902 (Charles Sprengel Greaves ed., 3d ed. 1843) (stating that robbery exists "where the taking has been by a putting in fear by means of threats to charge the party with sodomitical practices"); 9 Halsbury's Laws of England 661-62 (1909) (citing, inter alia, *R v. Jones* (1776) 168 Eng. Rep.

171; 1 Leach 139 and *R v. Donnally*[6] (1779) 168 Eng. Rep. 199; 1 Leach 193 regarding robberies accompanied by threats to injure the victim's "character or place by reason of being charged with unnatural practices").

As early as 1719, accusations of a crime against nature being used to demonstrate constructive violence appeared in English robbery cases heard in the Old Bailey, London's Central Criminal Court. The recorded proceedings in the Old Bailey from May 1719 report that a robbery victim accused Stephen Margrove and John Wood of threatening to "take away his Life and swear Sodomy against him" if he did not give them money. The Proceedings on the King's Commission of the Peace 6 (May 14-16, 1719) [hereinafter Old Bailey Proceedings] (altering archaic spelling), https://www.oldbaileyonline.org/browse.jsp?div=t17190514-42.[7] "[B]y means of this Violence, and being under a Terror, and in great-Fear," the victim gave Margrove and Wood all the money that he had, and the jury ultimately found both men guilty of robbery. *Id.*

In another early case in 1730, the victim accused Williamson Goodman of putting him in fear and taking all the money that he had on him after Goodman threatened to "swear Sodomy against [him]" if he did not give Goodman his money. Old Bailey Proceedings, *supra*, at 15

---

[6] The defendant's name in this case is spelled several different ways in the various treatises, reports, and historical sources. For the sake of consistency, we will use the spelling from the English Reports, "Donnally."

[7] The proceedings in the Old Bailey were reported in a "series of pamphlet reports of London trials" that were published from the 1670s until 1913. *See* John H. Langbein, The Origins of Adversary Criminal Trial 180, 182 & n.15 (2003). While one shortcoming of the pamphlets was that they tended "to compress the trials they report" without the reader "know[ing] what was being deleted or why," the accuracy of the pamphlets' content was trusted because "[t]he regularity and the increasingly official character of the reports means that they were unlikely to have tolerated fiction." *Id.* at 185. It has been said that these pamphlets "are probably the best accounts we shall ever have of what transpired in ordinary English criminal courts before the later eighteenth century." *Id.* at 190 (citation omitted).

(Jan. 16-20, 1730), https://www.oldbaileyonline.org/browse.jsp?div=t17300116-31. After threatening to swear sodomy against the victim, Goodman took the victim's money, making the victim turn his pocket inside out, and the jury found Goodman guilty of robbery. *Id.*

In a pair of cases involving the same defendant in 1759 and 1763, two separate victims accused James Brown of robbing them after he threatened to accuse them of sodomitical practices. In the 1759 case, Thomas Brown and James Brown followed the victim as he walked through a public park, and Thomas Brown approached the victim, "took hold of [his] arm, dragged [him] a little way out of the path, took [him] around the middle, and then pulled [his] breeches open." Old Bailey Proceedings, *supra*, at 20 (Dec. 5-7, 1759), https://www. oldbaileyonline.org/browse.jsp?div=t17591205-24. As part of a planned scheme to rob the victim, James Brown then approached the victim and Thomas Brown and exclaimed, "D-n you, you rascal, have I catch'd you?" and "D-n you, you dog, I'll have you hang'd, you sodomitical dog." *Id.* James Brown then dragged the victim down to the nearby waterside and demanded his money, which the victim gave to James Brown. *See id.* A passerby who had observed the entire event corroborated the victim's account, and while Thomas Brown was acquitted, James Brown was found guilty of robbery. *Id.* at 21-23. James Brown was eventually pardoned for this offense. *See* 2 The Ordinary of Newgate's Account 16 (1760), https://www.oldbaileyonline.org/browse.jsp?div=OA17600211.

In the 1763 case, a robbery victim turned over money to James Brown who had threatened to assert an "accusation of sodomy" against the victim. Old Bailey Proceedings, *supra*, at 222 (Sept. 14-20, 1763), https://www.oldbaileyonline.org/browse.jsp?div=t17630914-52. At the time of the taking, the victim testified that he felt physically "safe" within the "public house," although "not safe from [Brown's] oath that he swore he would lay to [the victim's] charge," and that Brown did not have "any weapon about him [at] the time of the robbery." *Id.*

10

The jury found James Brown guilty of robbery, *see id.* at 226, following the trial presided over by Baron Eyre, then Recorder of London, *see* 2 Edward Hyde East, A Treatise of the Pleas of the Crown 715 (1803). After this second conviction, Brown was executed.

Both of Brown's cases featured prominently in *R v. Jones* (1776) 168 Eng. Rep. 171; 1 Leach 139. The defendant charged with robbery in *Jones* allegedly made a threat of physical violence and an accusation of sodomy. Baron Hotham presided over the trial, and evidence supporting both theories of criminal liability — actual force and constructive force — was submitted to the jury. *See* Old Bailey Proceedings, *supra*, at 161 (Feb. 21, 1776), https://www. oldbaileyonline.org/browse.jsp?div=t17760221-5. As reported in East's *Pleas of the Crown,* the jury returned a verdict of guilty based upon the sodomy accusation:

> It was left to the jury to consider, Whether the prosecutor were put in fear, and under that impression had parted with his money. *And the jury declared that they thought such an accusation would strike a man with as much or more terror than if he had a pistol at his head; and they found the prisoner guilty.*

2 East, *supra*, at 715 (emphasis added); *see also* 2 Russell, *supra*, at 77-78.[8]

---

[8] English jurists and legal historians recognize that East's treatise amplified Leach's Reports. "*Leach's Reports* were significantly augmented by Edward East in his *Pleas of the Crown*, published in 1803. Although the book was in treatise form, East incorporated accounts of numerous twelve-judge cases that were not in print elsewhere." James Oldham, *Informal Lawmaking in England by the Twelve Judges in the Late Eighteenth and Early Nineteenth Centuries*, 29 L. & Hist. Rev. 181, 183 (2011). In the preface to his treatise, East noted that his "intention went further" than the goal of Leach's Reports of "publish[ing] a collection of crown cases." 1 East, *supra*, at vii. East explained that he had "accumlat[ed] . . . additional matter" and had been "further encouraged by the friendly communication of other [manuscripts]" from the jurists. *Id.* East listed 11 manuscript sources to which he referred when drafting his treatise, including "[c]opies of the reserved cases" that "were delivered to the several Judges before they met to consider of them" along "with their memoranda or notes of the grounds of the determinations." *Id.* at xv. East noted that he had "been liberally favoured with communications of this kind from several of the Judges." *Id.*

English historians have observed that there is not "one set of reports which is alone to be regarded as containing an authoritative exposition of the law as declared and applied in the instances reported" and that "[t]here is not, and never has been, any set of reports of which it can

11

After the trial judge confirmed the *Jones* verdict, it was reserved by Baron Hotham for review by an informal judicial tribunal known as the Twelve Judges. Review by the Twelve Judges was used "[w]hen a question of law or procedure arose during the conduct of a jury trial," and "the question could be reserved for collective deliberation by the twelve common law judges." Oldham, *supra* note 8, at 181. The Twelve Judges consisted of the four judges from each of the three common-law courts: the King's Bench, the Court of Common Pleas, and the Exchequer. *See id.* at n.1. "The practice of referring or reserving difficult points of law to the whole bench of judges dated back to at least the fourteenth century," and "[t]he power to reserve was confined to assize and Old Bailey judges." D.R. Bentley, Select Cases from the Twelve Judges' Notebooks 9, 12 (1997).

Though the Twelve Judges were not technically hearing an appeal, *see* John Baker, An Introduction to English Legal History 149 (5th ed. 2019), their review has been described as "a practice that functioned as a species of appellate review," Langbein, *supra* note 7, at 212, because the Twelve Judges themselves considered their decisions to be binding, Oldham, *supra*

be said that judges would listen to citations from them and from no others." Percy H. Winfield, The Chief Sources of English Legal History 186, 191 (1925). This fact is evidenced by English legal scholars citing *Jones* with citations to both Leach and East or even just to East, *see, e.g.*, 1 Hawkins, *supra*, at 215 n.3 (John Curwood ed., 8th ed. 1824); Henry Roscoe, A Digest of the Law of Evidence in Criminal Cases 745 (1836); 1 Russell, *supra*, at 902 n.(b) (Charles Sprengel Greaves ed., 3d ed. 1843); Richard Sargent, Principles of the Laws of England in the Various Departments 760 n.(z) (2d ed. 1843), a practice that has been followed by many American legal scholars as well, *see, e.g.*, Davis, *supra*, at 205 n.(d); John B. Minor, Exposition of the Law of Crimes and Punishments 115-16 (1894); Perkins & Boyce, *supra* note 3, at 448 n.42; 1 Francis Wharton, A Treatise on Criminal Law § 852, at 746 n.1 (William Draper Lewis ed., 10th ed. 1896). East's account of *Jones* does not conflict with Leach's report of the Twelve Judges' opinion but is consistent with it because this statement in Leach's report can encompass constructive force, not just actual force, based upon the jury's declaration of constructive force as the basis for their decision: "And the Judges were of opinion, that although the money had been obtained in a fraudulent way, and under a false pretence, yet that it was a pretence of a very alarming nature, and a sufficient degree of force had been made use of in effecting it, to constitute the offence of robbery." *Jones*, 168 Eng. Rep. at 173; 1 Leach at 141.

note 8, at 191. The precedential weight of the Twelve Judges' decisions persisted despite the fact that they were not always unanimously decided,[9] and their decisions "were at times considered to be weightier than decisions by only one of the common law courts, as all or most of the twelve judges would have participated." *See id.* at 193-96, 211-13. "In 1848 this informal tribunal was erected into a court called the Court for Crown Cases Reserved," 1 James Fitzjames Stephen, A History of the Criminal Law of England 311 (1883), and the previous informal practice was given statutory recognition, *see* 1 W.S. Holdsworth, A History of English Law 86 (1903).

The Twelve Judges reviewed the *Jones* case, and nine of them (the only ones sitting at that particular time)[10] unanimously affirmed the robbery conviction citing both cases involving James Brown as authority, 2 East, *supra*, at 715; *see also* Old Bailey Proceedings, *supra*, at 161-62 (Feb. 21, 1776), https://www.oldbaileyonline.org/browse.jsp?div=t17760221-5. The judges "agreed that the conviction was proper; for to constitute robbery there was no occasion to use weapons or real violence; but that taking money from a man in such a situation as rendered him not a free man," 2 East, *supra*, at 715.

The constructive force rationale — expressed in the *Jones* trial court verdict and approved during the Twelve Judges' review — was widely reported. *See* The Gazetteer & New

---

[9] In English courts, not unlike American courts, judicial precedent is established by the majority, not the minority, members of the presiding court. *See* Bentley, *supra*, at 18 (noting that "[t]here was . . . no requirement of unanimity"); Oldham, *supra* note 8, at 211-13 (confirming that the opinions by the Twelve Judges were considered binding regardless of whether they were unanimous or divided).

[10] Reserved cases were typically considered by all 12 common-law judges. *See* Bentley, *supra*, at 17 (noting that "all twelve judges attended" unless "a judge was ill, or had died or retired and not yet been replaced, or was for some other reason unable to be present," in which case "the discussion would proceed without him"). But when *Jones* was considered, two judges were absent, and one position was vacant. 2 East, *supra*, at 715 (noting this fact in the margin).

13

Daily Advertiser (London), Feb. 8, 1776, at 3 (recounting the victim's charge before the magistrate that he had given Jones money several times because he was "not wishing to be charged with so heinous an offence" with which Jones had repeatedly charged him (altering archaic spelling)); The London Evening-Post, Feb. 20-22, 1776, at 3 (reporting Jones's conviction in the Old Bailey for robbery "by threats of charging [the prosecutor] with a detestable crime" (altering archaic spelling)). The public interest was understandable, one commentator has observed, because "[c]haracter assassination of this peculiar sort had at this point in history become so terrifying that the jury felt able to convict Jones because 'they thought that such an accusation would strike a man with as much or more terror than if he had a pistol at his head.'" Antony E. Simpson, The Development of the Law of Blackmail in Georgian England: Common Law Creation of a Capital Felony 6 (Oct. 1986) (citation omitted).[11] The *Jones* verdict, most scholars agree, "was upheld by the Twelve Judges, who firmly stated their belief that violence, real or threatened, was not necessary in the case of robbery, if this unique type of character threat was offered." *Id.*

Three years later in *R v. Donnally* (1779) 168 Eng. Rep. 199; 1 Leach 193, the Twelve Judges again addressed the question whether an accusation of criminal sodomy could constitute constructive force under English common law. The case was referred to the Twelve Judges by Justice Buller, who presided over the jury trial in the Old Bailey. When he instructed the jury on the common-law principles governing robbery, Justice Buller stated "that accusing a man with an attempt to commit sodomy, which puts him in a state that he cannot act with his own will, is sufficient, and is violence enough to constitute the crime of robbery" as had "been decided by all

_____

[11] Simpson's unpublished manuscript was presented at the Annual Meetings of the American Society of Criminology and is on file with the National Criminal Justice Reference Service.

the judges," which is presumably a reference to the Twelve Judges' previous opinion in *Jones*. *See* Old Bailey Proceedings, *supra*, at 199 (Feb. 17, 1779), https://www.oldbaileyonline.org/browsejsp?div=t17790217-40. The factual question before them, Justice Buller informed the jurors, was whether the sodomy accusation, if one was truly made, imposed "such a restraint on the person accused that he must at all events be said to part with his money unwillingly." *Id.* In rendering their guilty verdict, the jurors found that the victim parted with his money because of the "terror and apprehension" caused by Donnally's accusation. *Id.* at 200.

After the Twelve Judges reviewed the case, Justice Willes publicly delivered at the Old Bailey a joint opinion on behalf of all the Justices. This joint opinion announced "the result of their deliberations" and stated that *Jones* was one of "several authorities" that "supported" the conclusion that a sodomy accusation, by itself, constituted constructive force. *Donnally*, 168 Eng. Rep. at 200, 202; 1 Leach at 195, 199. This joint opinion constituted the binding "judgment" that carried precedential weight. *See* 2 East, *supra*, at 726 (reporting that Justice Willes announced the Twelve Judges' "judgment").

In his separate seriatim opinion, Justice Willes stated that "[t]he laying of hands on the party" in *Jones* was a distinguishing fact but stated that it "made no difference" because "in Jones's case, which was very deliberately considered, that circumstance was not relied on" because the sodomy accusation "was as much a violence in reality on the party" and "constructive violence supplied the place of actual violence." 2 East, *supra*, at 723.

The trial judge, Justice Buller, joined his colleagues for the Twelve Judges review. In his seriatim opinion, Justice Buller stated (as he had earlier to the jury at trial) that "the cases which had been decided on this subject, [which would include *Jones*], concluded the present question." 2 East, *supra*, at 716-17. Baron Hotham also accepted what the "former cases determined on this subject," *id.* at 718, which no doubt included *Jones* given that he presided over Jones's trial in

15

1776. Baron Hotham was "clearly satisfied" that actual force "was not necessary, in order to constitute a robbery, where the property was obtained by means of a threat" of sodomy. *Id.* Justice Buller similarly found that "independent of those cases" that had previously been decided on the subject, the constructive-force doctrine was merely an application of the "general principles" of common-law robbery. *Id.* Justice Ashhurst agreed, clarifying that *Donnally* was not an "extension of the principles" of the common law but rather an application of them. *Id.* at 720-21. Interestingly, Justice Blackstone confessed he was initially skeptical of the constructive-force doctrine, but he "changed his own [mind]" based upon "the opinion of the other Judges" and "concurred with them that it was robbery." *Id.* at 721-22.

Given this historical record, most English jurists, legal historians, and commentators have concluded that *Jones* authoritatively applied the crime-against-nature doctrine to robbery cases governed by English common law:

- *R v. Knewland & Wood* (1796) 168 Eng. Rep. 461, 466; 2 Leach 721, 730-31 (listing *Jones* as the earliest case in which "[t]he fears unavoidably excited by" accusations of "sodomitical practices" was "determined by the Judges to be sufficient to constitute the crime of robbery");

- *Donnally*, 168 Eng. Rep. at 202; 1 Leach at 199 (listing it as one of the "several authorities" supporting their determination that an accusation of a crime against nature was sufficient constructive violence to prove robbery);

- 5 Richard Burn, The Justice of the Peace, and Parish Officer 169 (1810) (listing *Jones* as a case in which the prisoner was "convicted for a robbery, in obtaining money from the prosecutor[] on an accusation of an unnatural crime" and that "[t]he *same question* was afterwards very much considered in the case of [*Donnally*]" (emphasis added) (altering archaic spelling));

- 3 Joseph Chitty, A Practical Treatise on the Criminal Law 234 (1819) (listing *Jones* as the earliest case in a string of cases in which "it has been repeatedly decided, that to obtain money by threatening to accuse a party of an unnatural crime, though he is under no apprehensions for his life, is a robbery");

- 1 Wharton, *supra* note 8, § 852, at 746 & n.1 (listing *Jones* as the first case of "many cases" that have held "extort[ing] money under threat of charging the prosecutor with an unnatural crime" to be robbery);

16

- Theodore F.T. Plucknett, A Concise History of the Common Law 451 & n.1 (5th ed. 1956) (recognizing that "the actual extortion of money by only verbal threats was held a constructive robbery in [*Jones*]");

- Roscoe, *supra* note 8, at 745 ("That obtaining money from a man by threatening to accuse him of unnatural practices, amounts to robbery, was decided in Jones's case.");

- 3 Stephen, *supra*, at 149 (citing *Jones* in a footnote to support the statement that "[i]n 1776 the actual extortion of money by verbal threat to accuse a man of unnatural practices was held to be robbery");

- Herman Cohen, Roscoe's Digest of the Law of Evidence and the Practice in Criminal Cases 1011 (14th ed. 1921) (noting that *Jones* "is the earliest case of a mere oral threat" of charging one with an unnatural crime in order to obtain money as "being so held" to be robbery);

- H.J. Lethbridge, *Blackmail, Reputation, and Respectability*, 9 H.K.L.J. 214, 218 (1979) (noting that *Jones* "established this new or enlarged conception of robbery");

- W.H.D. Winder, *The Development of Blackmail*, 5 Mod. L. Rev. 21, 26 (1941) (noting that *Jones* is "often taken as the case which established that a threat to accuse of sodomitical practices is a sufficient foundation for robbery").

- Langbein, *supra* note 7, at 142 n.173 (citing *Jones* as an example of "the Twelve Judges sustain[ing] a conviction and death sentence for highway robbery, deemed to have been committed by extorting money from the victim on the threat of falsely charging him with sodomy");

- Simpson, The Development of the Law of Blackmail, *supra*, at 6-7 (recognizing "[t]he case usually cited as the watershed in this regard is that of Jones, heard in the Old Bailey in 1776" and explaining that despite the fact that some violence was offered to the victim in *Jones* and could have been grounds alone to sustain the conviction of robbery, as the Twelve Judges admitted in their opinion, the Twelve Judges "stat[ed] the new ruling that this traditional characteristic of the capital crime of robbery would not in the future have to be present" if an accusation of a crime against nature was made).

We find this historical background informative, but we need not deem this interpretation of *Jones* to be incontestable. Nor do we believe it necessary to replicate the immense scholarly effort that has vouched for it. We have four unanimous opinions in the Virginia Reports that have never been challenged or questioned — *Fleming*, *Maxwell*, *Falden*, and *Houston*. In each

17

of these cases, our predecessors on this Court have stated without qualification that the common law of the Commonwealth recognizes this doctrine in robbery cases. Those jurists were governed by the same Virginia reception statute that governs us. Having examined the historical record, we cannot say that they were plainly wrong in their recognition of this English doctrine.

Nor do we accept the supposition that *Fleming*, *Maxwell*, *Falden*, and *Houston* simply took the matter for granted by not offering any convincing historical argument for adopting the doctrine. We prefer to assume that the Virginia jurists in these four cases were aware of the scholarly commentary on this point and, perhaps for that reason, thought it unnecessary to elaborate on it. That said, we now have had the opportunity to reconsider this issue anew to determine if a compelling historical argument could be made that they erred in recognizing the doctrine. Based upon our own research on this point, we cannot say that they did.

### III.

In sum, as stated in *Fleming*, *Maxwell*, *Falden*, and *Houston*, Virginia common law recognizes the crime-against-nature doctrine in robbery cases. Because the General Assembly has not abrogated the doctrine, it remains the law of this Commonwealth.

*Certified Question Answered*
*in the Affirmative.*

JUSTICE MIMS, with whom JUSTICE POWELL joins, concurring in the result.

Because I believe that the English common law was received in the Commonwealth of Virginia in 1776 and the "sodomy exception" was not first applied in England until after that date, I decline to join the majority opinion. However because the question of the reception date in Virginia is not decided in the majority opinion, and reasonable minds can differ regarding the

18

year in which the exception was first applied in England, I will not dissent. I concur in the conclusion that is based upon this Court's existing case law.